THE STATE *against* CHESTER ASHLEY AND OTHERS.

MOTION *for a rule to show cause why an information in nature of a quo warranto, should not be filed.*

The writ of quo warranto at common law, was a high prerogative writ, in the nature of a writ of right for the king, against him who claimed or usurped any office, franchise, or liberty of the crown; and also lay in case of *non-user*, or long neglect; *mis-user*, or abuse of a franchise.

It was a civil proceeding, prosecuted by the king's attorney general, at the suit of the king, without a *relation*, to try a civil right; and the judgment, if for the king, was of seizure into the king's hands. No fine was imposed, or punishment inflicted on the defendant.

Informations, as the basis of criminal prosecutions are said to have existed co-eval with the common law itself; but, as a mode of determining civil rights between private parties, they seem to owe their origin to *St. Q. Anne.* Although informations in nature of quo warranto were exhibited by the attor-ney general long prior to the passage of that statute, yet the remedy given thereby, was never extended beyond the limits of the old writ. And that stat-ute neither increased nor abridged the authority of the attorney general.

Informations were not allowed at the instance of a private person, before the Statute of 4th Anne, nor after, except in the cases mentioned in that statute.

The information was a criminal proceeding; although upon conviction or dis-claimer there was also judgment of ouster, or seizure into the king's hands: and although it has long been applied to trying the mere civil right, the fine being nominal only.

Though the writ of quo warranto, and the information in the nature of a quo warranto, had a contemporaneous existence, yet their primary objects were essentially different; the mode of proceeding on them materially varied; they were, in some respects, attended with different results, and the form of judgment was never the same. One was strictly a civil, the other a criminal proceeding. They were, therefore, so different at common law, that they cannot, with propriety, be classed together, or comprehended by one com-mon name or description.

The constitution has conferred upon the Supreme Court, as the final tribunal to interpret, pronounce, and execute the law, to decide controversies and enforce rights, powers, and jurisdiction of an appellate nature only.

It leaves with the inferior tribunals the original cognizance of all cases and controversies between private parties, as well as all controversies in which the State may be a party, or otherwise interested, in which the sovereignty, or sovereign rights, powers, and franchises of the state are not involved.

But in cases involving the civil rights of the sovereign power of the state, af-fecting vitally, its character, and the proper administration of the govern-ment itself; in which the whole people, and every individual member of the community has a direct, immediate, and most sacred interest; when the exercise of a public right, or public franchise is the subject of controversy, the Supreme Court has original jurisdiction, and is vested with power to issue, hear, and determine writs of *quo warranto.*

The information in nature of a quo warranto, being different, as before stated, from the writ of quo warranto, the Supreme Court has no jurisdiction in case of such information, under the clause of the constitution which author-izes it to issue the writ of *quo warranto.*

The power granted to this court by the constitution, to issue "*other remedial writs,*" embraces only such writs other than those specifically enumerated, as may be properly used in the exercise of appellate powers, or of the power of control over inferior, or other courts, expressly granted by the constitu-tion.

LITTLE
ROCK,
Jan'y 1839

THE STATE
*vs.*
ASHLEY
& OTHERS.

The Supreme Court has no original jurisdiction in any case where the proceeding is, or must necessarily be of a criminal nature. The proceeding by information in nature of a *quo warranto* is of a criminal nature, and the Supreme Court has therefore, no jurisdiction thereof.

This was a motion made by the attorney for the state, for a rule against *Chester Ashley, Roswell Beebe, Elijah A. More, Richard C. Byrd, James DeBaun, William W. Stevenson,* and *James L. Dawson,* to show cause why an information in the nature of a writ of quo warranto should not be filed in this court against them, for intruding into, and holding without grant or warrant, the office of directors of the Principal Bank of the Real Estate Bank of this State. *Chester Ashley,* one of the acting directors, on behalf of himself and the others, appeared, and was heard upon the motion. As this case was decided upon the question of jurisdiction, a statement of the facts is here omitted, and will be found *post,* in the case of the state against the same, upon writs of *quo warranto.*

TRAPNALL, for the motion:

This is a motion made by the State, through its legal representative, for a rule on the defendants to appear and show cause why an information should not be filed against them as usurpers of the directory of the principal bank of the Real Estate Bank of the State of Arkansas. The motion is based upon the affidavits of Charles Rapley, and William Cummins; the purport of which is, that by the sixth rule of the central board, the election of directors shall be conducted by three commissioners, appointed by each of the local boards, on the first Monday of January in each year; that when the polls are closed the commissioners shall certify to the president, immediately, the number of persons voted for, and the number of votes given to each, and that the president shall forthwith issue a certificate of election, countersigned by the cashier, to each of the seven persons who have the majority of the votes. The directors elected, shall immediately enter upon the discharge of their duties. That by a resolution of the local board of the principal bank at Little Rock, William E. Woodruff, James DeBaun, and James Erwin were appointed commissioners to hold the election, with instructions to receive all legal votes, and when the polls should be closed, to issue certificates of election to each of the seven persons who should have a majority of the votes polled. That the commissioners proceeded to hold the election, and during its progress, rejected several hundred legal votes, with a design to, and there-

by securing a majority of the votes to the above named defendants, and excluding others who would certainly have been elected, if the election had been conducted according to law. That they believe that, immediately after the polls were closed, the commissioners under the aforesaid resolution, of the local board, a copy of which had been denied, issued certificates of election to the defendants, without "certifying the result of the poll to the president;" and the defendants forthwith took possession of the bank, and commenced a discharge of the duties of directors of the institution, without having a "certificate of election issued to them by the president, countersigned by the cashier;" and they still remain in the direction of the affairs of said bank.

If the showing made by the affidavits, be conclusive at this stage of the proceeding, or sufficiently satisfactory to show that the present position of the defendants in the bank has been gained by assumption, what is the appropriate remedy given by law, and to whom is it given? The right of banking is a public trust or franchise, conferred by a grant of the legislature: if this right is usurped or abused, the injury resulting from it is of a public nature, and therefore, the right of redress belongs exclusively to the State, as decided in the case of *The People* vs. *The Utica Insurance Company*, 15 *John. p.* 379, 386-7-8-9. See 5 *Wendell*, 301; 7 *Cowen*, 13.

Courts of chancery afford no remedy for the injury, because it is one of a criminal nature. See the case of the *Att. General* vs. *The Utica Ins. Co.*, 2 *John. Ch. Rep.*, 378-9; and because courts of law afford an immediate and ample remedy, by an information in the nature of a quo warranto; same case, decided by *Chancellor Kent*, 376-7-8.

Informations in the nature of a writ of quo warranto, are granted by the Courts of King's Bench, for the purpose of trying the rights of persons to any corporate, or other franchise into which they have intruded, for the purpose of removing them; *Exp. Dig.*, 688; 5 *Jacob, L. D.* 372; 2 *Wheaton Selwyn*, title quo war.

The writs of quo warranto, and informations in the nature of writs of quo warranto, are prerogative writs, and existing at common law, in the fourth year of James I.

By St. of Q. Anne, the proceeding was extended to other cases than embraced at common law, and permitted at the relation of private persons; and with these and some minor exceptions, the same course of pleading, trial, and judgment was pursued under the statute, that ob-

C

LITTLE
ROCK;
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

tained at common law; 5 *Jacob*, 372,377; 2 *Kyd. on Corp.* 415; *Esp. Dig.* 664; *Buller N. P.* 211.

The cases in which informations in the nature of a quo warranto are granted by this act, are where a man exercises a corporate franchise, or acts as a corporate officer, without having been *duly elected*, and *sworn* or *admitted*; 5 *Jacob*, 378; *Kyd. Corp.* 424.

And though an officer has been legally elected, yet, if the swearing in has not been regular, he shall be removed by quo warranto: for the swearing in is as necessary to a complete investment of his office, as the election; *Esp. Dig.* 693; 1 *Stra.* 582; In the case of *The People vs. Directors of the N. Y. Ins. Co.,* 4 *Cowen*, 358; 4 *Cowen*, 98.

The defendants have not qualified according to the sixth rule of the central board, therefore, if the rule is valid, and binding upon the corporation, they are liable to an information in the nature of a *quo warranto.* The authority of the central board will be found in the 9th, 21st, and 22d sections of the charter. By the 9th section they are given a revising and controlling power over all the acts and proceedings of the corporation as far as may seem necessary and proper for procuring a common concert of operation, with a view to the credit and welfare of the several banks, that is, a right not only to revise whatever by-laws the several banks may pass, and correct them, but to control, direct, and dictate what laws they shall pass, and dictate and direct their conduct also.

They shall exercise such other powers for the well governing and ordering the affairs of said banks as may be deemed necessary and proper to advance the general interests, provided the same be not contrary to the provisions of the charter, or the laws of the state; and in the 21st section it is provided, that it shall have the right to ordain and establish such by-laws, rules, regulations, and ordinances as THEY shall deem necessary and suitable for the government of said corporation, not being contrary to this act, the constitution of the United States, or of this state.

They not only have the right expressly given to revise and *control* the conduct of the different banks, to exercise such powers as may be deemed necessary and proper to advance the general interests, subject to the charter and laws of the state, and to ordain and establish by-laws, &c., which they may deem necessary and suitable for the government of the corporation, subject alone to the charter, constitution of the United States, and of this state; but by the 22d section, the

principal bank and its branches are expressly prohibited from passing any by-law, rule, ordinance, or regulation contrary to the by-laws, &c. of the central board.

Such construction ought to be put upon the statute as may best answer the intention which the makers had in view; *People* vs. *Utica Ins. Co.* 15 J. R. 380; *Bac. Ab. Statutes* 1, 5, 10.

By the 25th section, it is enacted that the central board shall fix upon the time for holding the future elections, as well for the branches as for the principal bank; and the directors shall be elected by the stockholders, or their attornies, &c.; but how the election is to be conducted the act is entirely silent, and has not expressly said who is to prescribe the mode of the election, but it says that the central board shall ordain and establish all such by-laws, and so forth, as they should deem necessary and suitable for the government of the corporation, not contrary to the charter, the constitution of the U. States, or of this state.

A rule prescribing the mode of the election was both necessary and suitable for the government of the corporation, if it were not contrary to the charter, or the constitution of the United States, or of this state: and such a one is this.

The twenty-fifth section further provides, that the director who shall receive a majority of the votes given, shall be declared elected; but how he is to be declared elected this act does not say, but it clearly gives to the central board, the right of prescribing the rule and mode. A by-law, or ordinance was required for that purpose, a by-law that would govern the elections in the principal bank, and all its branches, a general ordinance for the regulation of the whole corporation. The local boards have not the power given them by the charter, because, if it were, each board might regulate its own election by a different rule, destroy concert of operation, and the ordinance was indispensibly necessary. Certainly, then, the revising and controling power in the corporation, invested with express and full authority to pass all by-laws, &c., that should seem to them necessary and suitable for its government, had the necessary, exclusive, and it seems to the undersigned, unquestionable right of regulating this proceeding by an ordinance.

If it is established that the central board had the power to pass this ordinance, it cannot be contended that it is contrary to the charter, or constitution, or laws, and therefore must be binding.

When by the charter, the mode of electing officers is not regulated,

LITTLE
ROCK,
Jan'y 1839
THE STATE
vs.
ASHLEY
& OTHERS.
a power resides in the corporation to make by-laws for that purpose; *Esp. Dig.*, 695; 3 *T. R.*, 187; and when a by-law is made, the election must be made in pursuance of it, or it will be bad; *Esp. Dig.*, 695.

If the central board had the power, and the by-law is not contrary to the charter, constitution, or laws, the local board were expressly prohibited in the 22d section, from passing any by-law contrary to it. Therefore, the resolution of the local board was void, and the election not being conducted according to the charter, and sixth rule, was void; admitting, however, that the election was legal, the defendants have not been declared elected by the form prescribed by the sixth rule, to-wit: a certificate signed by the president, and countersigned by the cashier.

The question seems too plain, and too well settled by authority, to admit of doubt; but say that it is doubtful, which is the strongest view of it in favor of the defendants, still the court must grant the rule.

Where the question is doubtful, the court will award the rule; 5 *Jacob.*, 379; *Cowp.*, 158; 3 *Burr.*, 1485; *Douglas*, 352, 397; *Buller*, *N. P.*, 210, 1, 2; when the question is one of new and doubtful law, *Cowp.*, 58.

ASHLEY & WATKINS, *Contra:*

The Supreme Court is a court of appellate jurisdiction only, coextensive with the state, under such regulations and restrictions, as may from time to time, be prescribed by law. The writ of quo warranto, is one which confers original jurisdiction, and if the Supreme Court is authorised to issue it, there is a palpable contradiction, and ambiguity apparent on the face of the constitution, which must first be reconciled, and gotten over.

The other remedial writs, expressed in the constitution, to be on the same footing with the writ of quo warranto; namely: writs of error and supersedeas, certiorari, habeas corpus, mandamus, and also, those that are perhaps implied, of prohibition, and precedendo, do all confer more or less of appellate jurisdiction, where the acts and proceedings of inferior courts are complained of, and sought to be corrected.

The question then presents itself on the threshold upon this motion, whether a writ of quo warranto, is one of " the cases otherwise directed by the constitution," wherein the Supreme Court shall exercise original jurisdiction; or whether, on the other hand, the Supreme Court can or will issue or take cognizance of a quo warranto, in any

other way than where the case comes up legitimately before it, upon error or appeal from the judgment of a circuit court?

It detracts nothing from the high dignity and paramount judicial authority of the Supreme Court, to claim for it ultimate appellate jurisdiction in all cases, and appellate jurisdiction only: on the contrary, it is in acordance with the genius and spirit of our constitution and form of government, that there should be, in all cases some judicial tribunal of the last resort, unawed by power, unbiassed by prejudice, uninfluenced by haste, the confusion and the passion, always attendant upon the investigation of questions purely of fact, in the exercise of original jurisdiction;—in whose breast, the law in its purity is preserved, and from whose matured judgment there is no appeal.

Under that clause of our Bill of Rights, inviolate and unalterable, declaring that the right of trial by jury shall remain inviolate, the difficulty presents itself, how will the Supreme Court dispose of the disputed matters of fact, usually, and almost necessarily arising upon the pleadings in quo warranto. If the case now under consideration should happen to come up before the court for trial, upon the inspection of record evidence, it would not effect the general principle, or meet the difficulty in the multitude of other cases, wherein the evidence would rest, wholly or in part, in testimony and in depositions; 2 *Harris Entries, p.* 133, 210; 1 *Woodeson Lect.* 493; 3 *Woodeson Lect.* 345.

But it is a well settled principle, that whether the jurisdiction of the Supreme Court be original or appellate, it cannot exercise that jurisdiction, without the intervention of an act of the legislature. Our constitution, in all its leading features, is similar to that of the United States, and the powers given to the judiciary department in each, will bear the same construction. The construction of powers vested in the federal, and of those remaining in the state legislatures is indeed different. In the one case, congress can pass no law, which it is not expressly, or by necessity of strong implication, authorized by the federal constitution to enact; on the other hand, all the sovereign power of the people of a state, rests and abides in the state legislature, to enact any law which they are not expressly or impliedly restrained from passing, either by any grant of powers to the general government, or by the constitution of the state, but both the federal and state courts are statutory courts, of limited jurisdiction, accurately defined by the constitution and legislative enactment, and possess no common law or pre-

LITTLE
ROCK,
Jan'y 1839
THE STATE
vs.
ASHLEY
& OTHERS.
rogative jurisdiction whatever. There are numberless decisions going to show, that the courts of the United States, have not, and will not, exercise their constitutional jurisdiction, whether original or appellate, without the intervention of an act of congress, auxiliary to the provisions of the federal constitution. Mr. Justice Story, in the case of *Martin* vs. *Hunter's lessee*; 3 Con. Rep. Sup. Court U. S. p. 583, says of the federal constitution, that it unavoidably deals in general language. It did not suit the purposes of the people, in framing this great charter of our liberties, to provide for minute specifications of its powers, or to declare the means by which those powers should be carried into execution. Hence the powers are expressed in general terms, leaving to the legislature from time to time, to adopt its own means to effectuate legitimate objects, and to mould and model the exercise of its powers, as its own wisdom and the public interest should require. In the case of *Wheaton & Donaldson* vs. *Peters & Grigg*, 8 Pet. Con. Rep. p. 659; it was the opinion of the court, that the common law as it existed in England, has never been in force in all its provisions in any state in this Union. It was adopted, so far only, as its principles were suited to the condition of the colonies; and from this circumstance we see what is common law in one state is not so considered in another. And without going into minute detail, there is good reason in all this. In vain do we live under a written constitution, and a government of distinct legislative, executive, and judicial departments, if the judicial tribunals have the power, not only to expound and interpret, but to make the law, under the insidious distinction of declaring merely what the law is. It was the complaint of the olden time in England, that the judges of the king's bench, wherein were vested the vague prerogatives of the crown, and the boundless extent of common law jurisdiction not otherwise apportioned, and not the parliament, did make the law. In the case now under consideration, this court cannot take a step, without investigating the doctrine of quo warranto, as it existed prior to the fourth year of Jac. I.; and then fill up by judicial enactment the gaps in such portions as are found to be incompatible with our institutions. It must rake up the obsolete law learning that hath lain covered with the dust of centuries, and declare what the law is, of which we have heretofore lived in ignorance.

In the other departments of the government, the powers and duties of the governor, and all the executive officers, are clearly and specifically defined by statute, and the proceedings of the general assembly,

itself, are controlled by its own general rules. Is the judicial depart- LITTLE ROCK,
ment then singular in being able to carry out the general powers con- Jan'y 1839
ferred upon it by the constitution, without the aid of further legislation? THE STATE
Such a power is impliedly negatived by the various acts regulating judi- vs. ASHLEY
cial proceedings; by the fact that the general assembly has minutely & OTHERS.
provided for the exercise by the Supreme Court of its jurisdiction, in
appeals, and writs of error and supersedeas, as cases of more general
importance and pressing necessity, but through inattention or design
has left it to subsequent legislatures and the revisors of our statutes
from time to time, to make such regulations concerning the other sub-
jects of its jurisdiction, as they may deem advisable and the public
interests require. The refusal of all the judges of the Supreme Court
to grant a writ of error or certiorari with supersedeas in the case of
Moseley, where the record showed a conviction contrary to law, upon
the ground that the legislature had made no provision for such a case,
ought to be conclusive authority in this part of the argument. The
writs of error, certiorari, and quo warranto, all stand upon the same foot-
ing in the constitution; and at common law the writs of error and certio-
rari, lay to all inferior criminal jurisdictions, and the judgment affirmed
or reversed for error, in criminal or civil cases; 4 *Black. Com. p.* 391; 2
*H. P. C.*, 210. How much stronger then, is the exercise of original
jurisdiction by the Supreme Court in the criminal proceeding of quo
warranto, and in view of another clause of the constitution, which pro-
vides that *the circuit courts shall have original jurisdiction over all crimi-
nal cases which shall not be otherwise provided for by law;* obviously refer-
ring to such jurisdiction as the general assembly may deem it necessary
to vest in corporation courts; *Const. Art. vii, Sec.* 2.

If the Supreme Court can exercise original jurisdiction, and can
issue a quo warranto, under the general powers of the constitution in the
absence of any legislative enactment, it must do so, by virtue of our stat-
ute law, declaring the common law and statutes of the British Parlia-
ment prior to the year 1607, not inconsistent or repugnant to our consti-
tution and laws, to be in force; and of the constitution recognizing all
existing laws, not inconsistent with itself, to be in force, until altered or
repealed by the legislature. It behooves us then to enquire; what a
quo warranto was under the laws of Great Britain, prior to the time
I speak of. 1st: A quo warranto was in the nature of a writ of right for
the king, (or sovereign power; 2 *Inst.* 282,) and by this I understand,
that it is issued at the instance of the proper officer of the crown, and not

LITTLE ROCK, Jan'y 1839

THE STATE vs. ASHLEY & OTHERS.

at the discretion of the court. 2d: It lay only to individuals claiming or usurping a public corporate franchise or liberty, that is to say, such as emanated or ought to have emanated from the crown, and not in the case of private incorporations or liberties which did not affect or concern the royal prerogative. 3d: It was strictly a criminal proceeding; and accordingly, the determination of a quo warranto, if against the king, was final and conclusive; and further, that the defendant, if successful, was not entitled to costs; *Rex* vs. *Williams*, 1 *Bur.* 402. It seems to have been tedious in its progress, and oppressive to the subject. 4th: A quo warranto aimed at the existence of the corporation. If the franchise claimed, never had existed, or in other words, never had emanated from the crown, there the judgment was of ouster; if the franchise had once an existence, by grant or prescription which supposed a grant from the crown, but had become forfeit for misuser or nonuser, there was judgment of ouster and seizure into the hands of the king. 5th: By a quo warranto, the disputes or difficulties between the *individuals* composing a corporation, or exercising a franchise, though of a public nature, could not be litigated or determined. 6th: In a quo warranto there was no *relator*, at whose suggestion upon the record, the attorney general moved in the matter: the crown by its officer, was the real, as well as the nominal plaintiff. See *Selwyn's Nisi Prius by Wheaton*, and the authorities there collected on all these points: title, " *Quo Warranto*."

On the other hand, we find the information in the nature of a quo warranto to be a proceeding created and regulated by the statutes of Anne and Geo. II., *which have never been in force in this state.* It is a civil proceeding merely, and not a criminal proceeding; 2 *T. R.* 484. The successful party, whether plaintiff or defendant, *is* entitled to costs; the judgment is not final, for, though judgment be for the defendant, a new trial may be awarded; *King* vs. *Francis*, 2 *T. R.* 484. The officer of the government will institute the proceeding, subject to the sound discretion of the court, at the relation of any person aggrieved, and the court will enquire who are the real parties in the controversy, and if they deem it necessary, compel the plaintiff to give recognizance for costs; 1 *Salk.*, 376. The information in the nature of a quo warranto, does not necessarily affect the validity, or question the existence of the corporation, or franchise; by it the rights of an individual corporation are litigated, and if judgment be against the defendant, there is judgment of ouster. By the common law, and by the statute of Anne,

·when the·corporation or franchise had an·existence, there could be no judgment of ouster merely; but the judgment was that the franchise ·capiatur in manum domini regis; Sel. N. P. Tit. ·Quo War. But there is one principle common to both, and in the end it will be found to sustain my argument; it is this.  Lord *Kenyon*, so late as the thirty-second year of Geo. III. (*Rex* vs. *Shephered*, 4 *T. R.* 381; *King* vs. *Lowther*, 1 *Strange*, 637; 2 *Ld. Ray.*, 1409,) refused to grant even a rule to show cause, in a case then before the king's bench, because it ·was not a usurpation on the rights or prerogatives of the crown, for which only the·old writ of quo warranto lay; and that an information ·in the nature·of a quo warranto could only be granted in such·cases. ˙Same principle in *Rex* vs. *Ogden*, 10 *B. & C.* 230.

Should the judges of the Supreme Court be satisfied upon investigation, that a quo warranto,·and an information in the nature of a quo warranto, are widely different; not only in form, and the mode of pro-·ceeding, but in substance and effect, they must presume that the framers of our constitution meant what they said when they used the term quo warranto, and cannot put a forced construction upon language of plain and obvious import.

I deem it unnecessary to argue, that the motion before the court, cannot now, or in any subsequent stage, involve any thing more than a controversy between a few individual members of a *private* corpora-·tion, in which, indeed, many citizens of the state are deeply and vitally interested, but in which the people of the state as the sovereign power, ·are not directly concerned, and over which they have no control. Because, as I understand the motion, and the affidavits upon which it is based, the relators so called, do not charge that we have usurped or intruded into any public office or franchise belonging to the state; or in the gift of the state; nor is it pretended that the sovereign power of the state, would have any authority to fill the vacancies which they claim this court might occasion by judgment of ouster against the present directory.

If, then, the motion before the court, is, what it purports to be, a motion based upon the affidavits of Charles Rapley and William Cummins for a rule upon *Chester Ashley and Others*, to show cause why an information in the nature of a quo warranto should not be filed, &c., the proceeding is not a quo warranto, but an information in the nature of a quo warranto: an entirely different proceeding, of which this court· can take no cognizance whatever, and about a subject matter, which

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs:
ASHLEY
& OTHERS.

before and since the statute of Anne, could not be affected by a quo warranto, or an information in the nature of it.

*Quere:* Whether the proceeding ought not to have been against the defendants severally, in order that they might not be precluded and disabled from disclaiming, or severally pleading separate and different matters of defence? 2 *Maul. & Sel.* 75.

Hitherto, my whole argument has tended to show that the court ought not even to entertain the motion. But by the mode of proceeding which the relators have adopted, it is admitted to be in the sound discretion of the court, to sustain or overrule the motion, to grant or refuse the rule, as their better judgment shall dictate. It is then, legitimate and proper upon the consideration of the motion, to enquire, whether the affidavits of the relators, present a sufficient case to warrant the further action of the court.

I will not recapitulate the minute criticisms upon the affidavits, which I pressed in argument. But I submit to the examination of the court whether there is in either of the affidavits, throughout, one distinct material allegation of fact, much less any chain or connexion of facts, upon which the court can found any correct judgment. I assume it to be a settled principle, that a court can infer matters of law from facts which are correctly stated, but, that no court can infer one fact from another fact stated, unless the inference is *ex vi termini* obvious. If I may so speak, the affidavits are demurrable, for containing superfluous and irrelevant matter: See *Chitty's General Practice on the subject of Affidavits*; and the matters of fact of law and of argument are so blended together, that one part cannot be rejected as surplusage, without rejecting the whole. It is immaterial in this part of my argument, whether this be a criminal or a civil proceeding. In either case, the affidavits upon which the whole proceeding, fraught with the utmost consequence to the property of individuals, is sought to be founded, should be certain to a certain intent in general, and taken most strongly against the relators, who are indeed unfortunate if with a full knowledge of all the facts, their own showing is insufficient; *Rex* vs. *Mein*, 3 *T. R.* 597.

As to the supplemental affidavits, there is abundant authority going to show, that in a proceeding of this nature, after a party has taken his ground, the court will not permit him to shift it, or to amend his affidavit, unless under peculiar circumstances, and then only by allowing him to dismiss the proceedings and commence again *de novo*; *Rex* vs. *Osbourne* 4 *East.* 327.

LITTLE ROCK, Jan'y 1839

THE STATE vs. ASHLEY & OTHERS.

Upon the whole view of the argument upon the motion, has the Supreme Court original criminal jurisdiction in any case. If it has jurisdiction, can it exercise it, unless the mode and means of exercising it are provided by law? If the court can so exercise jurisdiction, in a quo warranto, is the proceeding now before the court a quo warranto? If a quo warranto, and an information in the nature of a quo warranto be one and the same thing, have the relators made out a sufficient case in their affidavits, for the court to grant the rule?

The defendants, so far as their own acts, and the validity and fairness of the election in question is considered, do not shun a thorough investigation; but for the safety of the institution confided to their care, they do at this critical period of its existence avoid a public exposure of its affairs.

I respectfully invite the attention of the court to the papers which I have been permitted to file upon the argument of the motion. They are recorded evidences, and relate to matters, which are stated or alluded to in the affidavits themselves. Upon examination of these papers, or at least of the charter of the Bank, I trust the court will be satisfied, that by the charter of the Bank, the general delegation of power to the Central Board, after a specific enumeration of powers, was nugatory and void—that under it the Central Board had no authority to prescribe that the presidents of the principal Bank and branches, should give to the persons elected a certificate of their election, thereby enabling him to suspend or wholly defeat at his caprice, a valid election. That it was for the principal Bank, in all other respects than as to the time and place, to regulate the election of its own directors. That in point of fact, such a certificate could not be obtained; for asmuch as the President pro. tem. upon being left out as director, at the election in question, not only ceased to be President pro. tem. but ceased to be a director, and had not actually been a director for some three months previous to the election; because, by the requirements of the charter, the first directory elected on the     day of October, 1837, were to continue in office for one year, and not for any longer period. The Relators were present at and concurred in the election, and voted for four of the seven directors, whom they are now seeking to remove. Vide case of the King vs. Symmons, 4 T. R. 223.

I trust the court will be satisfied, that the judges at the election

LITTLE
ROCK,
Jan'y 1839
THE STATE
vs.
ASHLEY
& OTHERS.
acted properly in rejecting every vote which they did reject; That the commissioners appointed to *hold* the election at least acted properly in rejecting the votes offered for Ferrebe's estate, for Davies and Ware, for Cummins and Notrebe, which will leave the result wholly unchanged. That the transfer of stock from the Branch at Chicot, was in contravention of the charter, because it appears from the records of the Bank, that at the time of the transfer there was no *excess* at that Branch; but really more stock on the books of the principal Bank, than there was at the Chicot Branch; and that if the judges had admitted every vote, which the relators claim they ought to have received, it could by no possibility change the result, except on to *one* of the individuals elected. That the directors have complied so far as lay within their power, with the absurd regulation of the Central Board, by obtaining from the President *pro. tem.* of the principal Bank a certificate of their election.

Here I respectfully urge it upon the court, that if the revising and controlling power, vested by the charter, in the Central Board, over the *acts* and *proceedings* of the principal Bank and Branches, means any thing whatever, *there* is the place for the validity of this election to be examined into and contested; that is the tribunal to which the relators ought to have appealed, if perchance they have suffered injury. Vide information refused *Rex* vs. *Dawes; Rex* vs. *Marten,* 4 *Bur.* 2123. See also *King* vs. *Stacy,* 1 *T. R.* 3; 2 *B. B. & A. A.* 479.

But what is to be effected by this proceeding, should the relators prove successful? If the court gives judgment of ouster against the present directory, the old directory will *not* thereby be reinstated; *because their term of service by the charter has expired.* The Bank would be left without control, disorganized, discredited, ruined; and when your Honors render such a judgment, you should in mercy place the Bank in the hands of trustees, to take charge of the effects and wind up its affairs.

Then, will the Supreme Court grant the rule, or listen to an information, upon light and trivial grounds, wherein the only result can be, the rendition of an idle and nugatory judgment, to the ruin of an institution, whereon are anchored the hopes and prosperity of the State?

COCKE and PIKE, for the motion:

The counsel for the motion respectfully submit:

That the position assumed by the opposing counsel, that this court cannot take jurisdiction of this matter, inasmuch as it is no exercise

of *appellate* powers, is not warranted by the language of the Constitution. That instrument declares that the Supreme Court shall, " *except in cases otherwise directed by this Constitution*," have appellate powers only. The section in which this provision is contained, is the *only* one referring to or defining the jurisdiction of the Supreme Court; and if there are " cases otherwise directed," in which this court can exercise original jurisdiction, they must be looked for in that section; and clearly are no other than the issuing of the writs therein named, including writs of *quo warranto*, and the power of hearing and determining the same. *Rev. St. p.* 33—*s.* 2.

LITTLE,
ROCK,
Jan'y 1839

THE STATE
*vs.*
ASHLEY
& OTHERS.

The objection that the exercise of this power by the court would abrogate the provision of the Constitution, that " the right of trial by jury shall remain inviolate," hardly merits serious notice. What right of trial by jury is to remain inviolate? Clearly the right of trial existing at the adoption of the Constitution. What that right is may be easily discovered. By the code of laws bearing the name of Henry 1st, compiled under his direction not long after A. D. 1100, it is provided that " every man shall be tried by his peers of the vicinage; and we wholly reject all foreign forms of trial:" And by Magna Charta, that " no free man shall be arrested or imprisoned, or deprived of his freehold, except by the regular judgment of his peers or the law of the land." See *Crabb's Hist. of Eng. Law*, 59, 139. And it has always been decided, both in England and America, that these provisions do not include proceedings in Chancery or Admiralty. And our Constitution, when it reiterates the clause of Magna Charta last quoted, means that every man shall be tried, and his rights determined, either by jury, or the mode of trial pointed out by Common Law: else why the phrase " law of the land." In the case of *Clark* v. *United States*, 2 *Washington*, 523, WASHINGTON Justice said, " What is there in the Constitution or laws of the United States, which requires the trial to be by jury, in the case of an information *in rem*, on the admiralty side of the District Court? The former preserves that mode of trial in suits at common law. But an information *in rem*, in a case of admiralty jurisdiction, is not a suit at common law, but an admiralty proceeding, where the trial never is by jury." See *State Bank* v. *State*, 1 *Black*, *p* 272.

It does not necessarily follow, therefore, that in every trial the accused is entitled to a jury. And if it did, still this court would, if governed by the common law practice, as we shall show it must be, direct

LITTLE ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

the issues made up to be tried by a jury. *Willcock on Corp.* 497: *Rex. v. Amery,* 1 *T. R.* 363: *R. v. St. Mary,* 7 *T. R.* 735; *R. v. Whitchurch,* 8 *Mod.* 211.

Another position, and one on which reliance seems to be placed, is, that although the Constitution has given to this court the power to issue writs of *quo warranto,* and to hear and determine the same; yet that power cannot be exercised, and the grant thereof is inoperative, until the legislature shall have presented the mode and form of proceeding. And it is further discovered, that State Courts, like the Courts of the United States, have no common law jurisdiction.

No common law jurisdiction—when the common law and general statutes of Great Britain, up to 1607, are by positive enactment recognized as a part of the law of this land. But the forms and mode of proceeding, it is said, are no part of the common law—because they have been mere inventions of the judges. How much of the common law is contained in statutes and acts of Parliament—how much merely in decisions of courts, and maxims handed down from age to age, and recognized as part of the common law? Let us take as one example the method of trying title to land. We have till recently had no statute providing the mode of proceeding in such cases—but our courts have every day taken cognizance of actions of ejectment. Yet if the argument used by the opposing counsel be good, there is no such jurisdiction, because it is an action not known to the old common law—authorized and invented by English judges, and the mode and manner of proceeding wherein have not been directed by legislative enactment. The writs usually used to try the title to land were, writs of entry in the nature of an assize; writs of entry *sur disseizin en le per:* writs of entry *sur disseizin en le per et cui:* writs of entry *sur disseizin en le post:* and some forty others, of entry and assize.—These actions were all superseded, not by statutory provision, but by the practice of the courts, long before 1607. The action of ejectment was originally considered an action of trespass, which went for the recovery of damages only, but in the time of Edward IV, it was held that the plaintiff therein should restore what remained of the unexpired term, as well as the damages, as appears by the year book of 7 *Edw. IV. fol.* 6. And this opinion, says a writer upon the subject, *was confirmed into law,* by the decisions of the courts in the reign of Henry VII. See *Crabb.* 418, 448. 3 *Co. Litt.* 209 *N. L.* And it may safely be asserted that nearly all the forms of action now in use, and

LITTLE
ROCK,
Jan'y 1839

THE STATE
*vs.*
ASHLEY
*&* OTHERS.

the rules of proceeding therein, and nineteen twentieths of all the principles of the common law, have been adopted entirely by judicial decision, and not by legislative enactment.

The opposing counsel are equally mistaken as to the extent to which the common law has been adopted in the United States and this State. They have confounded two questions. It is true that in the courts of the United States, there being no provision in the National Constitution, adopting the common law, including equity and admiralty, as well as *legal* doctrines, it has been held that it is not the common law of the United States. But it never has been doubted that the constitution and laws of the United States were made with reference to the existence of the common law: that when an authority or a power is once given, the nature and extent of that authority, and the mode in which it should be exercised, *must be regulated by the rules of the common law.* *United States* v. *Cooledge,* 1 *Gallison* 488. The courts, it is said, cannot derive *their right to act* from the common law. But when the general jurisdiction is given, the *rules of action under* that jurisdiction, if not prescribed by Statute, may and must be taken from the common law, when they are applicable, *because they are necessary to give effect to the jurisdiction:* and it is a settled doctrine, both in common and civil law, that where the jurisdiction is given, every thing also would seem to be granted without which the jurisdiction cannot be exercised. See 1 *Kent,* 315 to 319. And chancellor Kent, after considering the whole subject, comes to the conclusion, that, "when the jurisdiction is once granted, the common law, under the correction of the constitution and Statute law of the United States, would seem to be a necessary and safe guide, in all cases, civil and criminal, arising under the exercise of that jurisdiction, and not especially provided for by statute. 1 *Kent,* 320, 321. *Robinson* v. *Campbell,* 3 *Wheaton* 212; 10 *Wheaton* 159. The court, therefore, would proceed in this case according to the rules of the common law, even were it not adopted by statute as the law of the land. Should the court decide even, that under the constitution alone, it could exercise no jurisdiction, except to issue a *writ* of *quo warranto,* still we contend, that the constitution having given this court power generally over the subject, we are entitled to the common law remedy, (as we shall show it to be,) by information. The common law is the common jurisprudence of the people of the United States, was brought with them as colonists, and adopted, so far as appeared applicable to our institutions

LITTLE
ROCK.

Jan'y 1839

THE STATE
*vs.*
ASHLEY
*&* OTHERS.

and circumstances. It is our patrimony. It was claimed by the Congress of the United States in 1774, as a branch of those " indubit-able rights and liberties to which the respective colonies are entitled." And to use still further the words of Kent: " It fills up every interstice, and occupies every wide space which the statute law cannot occupy."

And we do assuredly claim that we have the same right to have leave to file our information, and have it proceeded on by the mode fixed by the common law, as we have to bring in an inferior court an action of ejectment; and the counsel opposing might as well object to our bring-ing such action, because the legislature had not adopted it, or fixed the mode of proceeding in it; and because it is an action invented by English judges; and that, therefore we should resort to our writ of as-size, or any other obsolete and antiquated writ.

Some two days were consumed by the counsel opposing, in a disser-tation upon the difference of a *writ* of quo warranto, and an informa-tion in the nature of a quo warranto; and he still seems not to have arrived at a clear understanding of the subject. In order to meet at once several of his objections, it may be as well to examine in the first place the nature of the writ of quo warranto, the proceedings upon it, and the time when it fell into disuse—and also the common law jurisdiction of the court of K. B. as to informations.

First, then, what is a *writ?* BRACTON defines it thus: " *breve quidem cum sit formatum adsimitlitudinem regulae juris: quia breviter et paucis ierais intentionem proferentis exponit, et explanat, set regala juris rem, quae slt, brerrer enaviat. Non tamen ita breve esse debeat quin rationem et tim intentionis convineat.*" 3 *Co. Lit.* 348. It was called *breve,* because it contained briefly *the matter of complaint* alleged by the plaintiff. An original writ is a mandatory letter, issuing out of the court of chancery, under the great seal, and in the King's name, di-rected to the sheriff, containing a summary statement of the cause of complaint, and commanding him in some cases, to command the de-fendant to do the thing required, or if he failed to do so, then to sum-mon him to appear and show reason wherefore he had not done so— and in others, requiring the sheriff, if the plaintiff *should make him secure,* &c. to cause the defendant to appear without any option. The former was called a *pra ecipe*—the latter a *si te fecerit securum.* See *Crabb* 115: *Stephen* 5: *Tidd* 116: 3 *Co. Lit.* 349. One object of the original writ, therefore, is to compel the appearance of the de-fendant in court; but it is also necessary as authority for the institu-

tion of the suit: for it is a principle (subject only to the exception introduced by the practice of proceeding by bill) that no action can be maintained in any Superior Court without the sanction of the King's original writ: the effect of which is to give cognizance of the cause to the court in which it directs the defendant to appear. To sue out an original writ is consequently, the first step taken in the suit. It is the business of the plaintiff to sue it out, and he obtains it as a matter of course. *Steph. Plead. p.* 5, 6. The original writ of quo warranto was in the nature of a writ of right for the King. *Willcock,* 439. *Gilb R.* 151; *Rex* vs. *Staverton, Ydv. R.* 191. The original writ was never used as a process for compelling the appearance of the defendant. At a very early day it was the practice for the plaintiff to file a draft of the original writ with the proper officer of the court of chancery, and in the meantime without waiting for the original the capias or summons issued in the first instance, and the original was seldom or ever taken out of the office. *Steph: Plead.* 26, 27. There is a broad distinction drawn in the books between the original *writ* and the *process;* the former being the foundation of the suit, and the latter the means by which the defendant is compelled to appear.

A brief statement of the different kinds of process necessary to be issued before there could be any final determination of the matter, will show the court the cause of the great delay in proceedings anciently upon writs original, and the reason why many such suits have fallen into disuse. If the party did not appear on the summons, then he was attached by pledges, and afterwards by better pledges. If he still did not appear, the sheriff was commanded *quod habeas corpus*, to take the body. If the sheriff returned *non inventus* there issued a *distringas per terras et catalla*, after that another *distringas* commanding him also to take the body; after that another *distringas ne manum apponat;* and lastly a writ to take the lands and chattels into the King's hands. Thus there might be one summons, two attachments, a capias (as it was afterwards called) and four distresses. *Crabb,* 280; *Tidd,* 125; 2 *Co. Lit.* 359, *N. II. Stephen's Plead.* 27. We will now proceed to consider the origin and nature of the writ of quo warranto, and to show that the writs of quo warranto and information were concurrent remedies at common law. The ancient writ of *quo warranto* was a writ by which the *mere right* was tried: it was a merely *civil* proceeding. The information in the nature of a quo warranto was a *criminal* proceeding, and formerly upon such information the party

LITTLE ROCK, Jan'y 1839

THE STATE *vs.* ASHLEY & OTHERS.

E

LITTLE ROCK, Jan'y 1839

THE STATE vs. ASHLEY & OTHERS.

could only be punished for the usurpation, but now judgment of ouster may be pronounced: *Rex* vs. *Bennett*, 1 *Strange*, 102; *2d Inst.* 282. *Yelv.* 190; *Cro. Jac.* 260; *Co. Ent.* from 527 to 564. *Rex* vs. *Ponsonby;* 1st *Vesey* 6. *Formerly before the Statute of Gloucester,* 18 *Ed. I,* the King exercised a power of sending commissioners to inquire into the right to franchises, and if no charters were produced the liberties were seized unto the King's hands without any formal trial. 1 *Inst.* 280. This being much complained of, the statute of quo warranto was made in order to remedy the grievance. It is said in some of the authorities, that this statute was the foundation of the proceedings in quo warranto; in others that it is merely the old common law writ and proceeding: *King* vs. *Amery*, 2d *Term R.* 540; *Crabb*, 175. This statute directs that such as had liberties should be permitted to use them so as they made no encroachments on the crown till the coming of the Justices in eyre: and directs the sheriff to make a proclamation that all those who claimed liberties should be before the Justices in eyre at the next assizes to show quo warranto they held them, &c. and they were allowed a certain time. But if the party came not before the justices in eyre the franchises should be seized into the King's hands nomine districtionis, which the party in the same eyre might replevy: but if he did not replevy them while eyre sat in that county, the franchises were lost and forfeited forever. 2 *Inst.* 282: And by *statute* 18 *Ed. I,* it was declared that if any should object that they were not bound to answer without an original writ; yet if it appeared that they had usurped any liberty upon the King or his ancestors, this objection would not avail them; but they would be compelled to answer without an original writ. *Crabb*, 175. These proceedings upon the writ of quo warranto were had before the justices in eye, or justices itinerant. The appointment of these justices took place as early as the 18th year of *Henry I,* by whom the kingdom was divided into circuits, and three justices in eyre appointed to each. *Crabb.* 103. The necessity of these justices was superseded, and their commissions not revived. according to Sir MATHEW HALE, after the 10th year of Ed. III; *Crabb*, 277, and informations in nature of quo warranto came into general use upon the cessation of eyres at t··· ···· . *Gilb. R.* 153 Lord Coke says, 2d *Inst.* 498, that with justices in eyre, this branch lived, and with them it died. 1 *Str.* 105.

It is clear from these authorities, that the opposing counsel have entirely mistaken the nature of a *writ* of quo warranto. It was not, as

he asserts, a *criminal*, but a civil proceeding; and in the nature of a writ of right. It was not the *process*, but merely the foundation of the suit, and the party usurping was compelled, by statute of Edward I, to answer, *although* there was no regular writ.

Let us now inquire as to the origin of the proceeding by information. That, as we have already shown, was at first a merely criminal proceeding, whereby the defendant was punished for the usurpation, but no judgment of *ouster* could be pronounced. " Since the introduction of writs," says a standard writer upon English law, " it has become a maxim in law, that no suit should be commenced in the King's Courts without a writ; but this is to be understood only in reference to ordinary cases. "There were other modes of proceeding, *of more . ancient date than that by writ*, which were more adapted to the extraordinary jurisdiction, exercised by our Kings at an early period, in the administration of justice." One of these was by *bill*, which was a sort of plaint made *personally* in court, in King's Bench, Exchequer and C. B. Another mode, of unknown antiquity, in the nature of a verbal complaint, was by suggestion or surmise, which at a very early day excited the jealousy of the Commons, with regard to the Council and Exchequer; but does not appear to have been resorted to in K. B. in common cases, so as to awaken any particular observation: and *in matters* affecting the King, suggestions were admitted without dispute, and were afterwards established under the name of informations.— *Crabb*, 294. The *Common Law* jurisdiction of the court of K. B. to grant leave to file an information of this kind, is broadly laid down in *Willcock*, 456, 7, and cases there cited. That power existed at *Common Law*, and the Statute of Anne only regulated the mode of proceeding.

We, therefore, deduce from this statement of the law, that by the common law in force at 1607, there was but one method of proceeding in quo warranto—that that method was by information—that there never had been any necessity for an original writ—and that the *process* against the defendant was as entirely different from the writ of quo warranto, as it was from the information. The Constitution has given this court jurisdiction over the subject matter—it has authorized them to hear and determine it—and if so, the common law being also adopted, this court can proceed in any method known to the common law. In 1607 what would have been understood by the expression, " a writ of quo warranto?" Undoubtedly a proceeding by quo war-

ranto, whether by writ or information. In either case, the process would be a summons—and it is merely a question in what way the suit shall be brought into court.

But it is objected that a quo warranto is a *prerogative* writ—not a remedial one. What is a remedial writ? So a mandamus is defined to be a *prerogative* writ. It is not a writ of right, and to issue as a matter of course, but a *prerogative* writ, and so are writs of *prohibition* and *procedendo*. *Willcock*, 354; 2 *T. R.* 335. Yet all these are not the less *remedial*. *Cas. Temp. Hard.* 99.

The opposing counsel has laid great stress upon the point, that the writ of quo warranto lay only in cases of usurpation of *public* franchises. Admit the position to be true, and still it has been decided, in the case of *The People v. Utica Ins. Co.* 15 J. R. 336, that, every privilege or immunity *of a public nature*, which cannot legally be exercised without legislative grant, is a public franchise: and that *the right of banking* is a public franchise. We are therefore within the rule, admitting it to be as stated.

But the position that quo warranto only lay in cases of usurpation on some franchise of the crown, is not correct. See *R.* v. *Nicholson et al.* 1 *Str.* 299. In that case, by *private* act of Parliament, for enlarging and regulating the port of Whitehaven, several persons were appointed Trustees, and power given them to elect others, upon vacancy by death or otherwise. The defendants took upon them to act as trustees, without such an election as required by the statute, and upon a motion for an information in nature of a quo warranto against them it was objected by the counsel for the defendant, that the court never grants these informations, but in cases where there is a usurpation upon some franchise of the Crown. To this it was answered and resolved by the court, that the rule was laid down too general, *for that informations have been constantly granted*, where any new jurisdiction, *or a public trust* is exercised without authority. See also *R.* v. *Boyles*, 2 *Ld. Raym.* 1559. It is sufficient that it is a public office, and concerns the public. See also 5 *Mass.* 230. If merely private, it will be denied. *R.* v. *Lowther*, 2 *Ld. Ray*, 1409 & 1 *Str.* 637.

It is said, also, that a quo warranto is properly aimed against the *existence* of the corporation. Such is not the case. It is true, that in the time of Charles II, charters were taken away by this proceeding, but this has been denied to be law ever since. These proceedings were an illegal exercise of arbitrary power, by means of a corrupt

judge. A scire facias is the only proceeding by which a corporation can be deprived of its existence. A quo warranto aims at the exist- ence of the franchise, but not of the corporation. The latter will still exist, though every franchise be stripped away. See *R.* v. *Ame-* *ry,* 1 *T. R.* 515; *Willcock,* 334, 335, 336.

It is, also, said that by both the common law and the statute of Anne, there must be, in all cases where the corporation or franchise had an existence, a judgment of seizure into the hands of the King. This is not correct. Where the franchise usurped might be repossessed and enjoyed by the King, there he had judgment of seizure; in all other cases there was judgment merely of *ouster*. *R.* v. *Hertford* 1 *Ld. Raym.* 426; *Willcock,* 499; *Strata Marcella,* 9 *Co.* 25 b.; *R.* v. *Hearle,* 1 *Str.* 627; *Symmers* v. *R., Cowp.* 510; *R.* v. *Amery,* 2 *T. R.* 566: *R.* v. *Pasmore,* 3 *T. R.* 214.

It is urged that the proceeding should have been several. See uppon this point *Willcock,* p. 458, *Sec.* 343, 351, 425, 426, and cases there cited.

And the court will here remark, that this being merely a motion preliminary, and to show cause, the court may grant the rule in such shape as shall seem proper. The rule may be, either to show cause why a *writ* of quo warranto, an information in the nature thereof, or several informations, should not issue, as the court in their discretion may think proper.

As the question of jurisdiction is the most important one, and as that question is raised principally upon the difference between the writ of quo warranto, and the information in the nature of a quo warranto, we will briefly recapitulate the positions we have assumed on that point.

1st. Where an authority or power is once lawfully given, the nature and extent of that authority, and the mode in which it should be exercised, must be regulated by the rules of the common law. Where the jurisdiction is given, every thing is granted, without which the jurisdiction cannot be exercised.

2d. This court has original civil jurisdiction to issue writs of quo warranto, and hear, and determine the same.

3d. No original writ of quo warranto, or any other original writ, according to the definition thereof at common law, can be issued by this court; because original writs in England did not issue out of the same court in which the cause was to be tried, but out of chancery, under the great seal. So that in this State the whole system of original writs is abrogated and annulled.

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

4th.   That the writ original was not the process, but the *foundation* of the action; and long before the 4th year of James the I, it ceased to be issued in any case, and no objection could be taken for the want of it.   And, therefore, when the Constitution speaks of issuing *writs* of quo warranto, it means merely to give the power of issuing the *process*, in proceedings of the kind, and does not dictate what shall be the foundation of the action.

5th.   That the process at the 4th year of James I, was a summons, which is the writ of quo warranto, and that process or writ of quo warranto may issue upon an information.   "

6th.   That at common law no writ of quo warranto was necessary, nor could the party object to the want of it, but was bound to answer upon the summons, whether there was a writ original or not.

7th.   That the information in nature of a quo warranto came into use on the cessation of justices in eyre, and took the place of the writ of quo warranto, and thereby became a civil proceeding, although at first it was a criminal proceeding.   So that since the establishment of the court of King's Bench, the procession the information has been in law and fact the *writ* of *quo warranto.*

In addition to these conclusions, we further refer the court, upon the question of jurisdiction to the case of the *Commonwealth* vs. *Sprenger et al,* 5 *Binney,* 353, in which an information of this kind was tried in the Supreme Court, although the St. 9 Anne had not then been adopted in Pennsylvania: also to 3 *Serg. & Rawle,* 52.

And the Supreme Court of Missouri, in a case in the 3d Volume of their Reports, under a clause in the Constitution, of which ours is an exact copy, has decided That as the Constitution gives that court the power to issue writs of quo warranto, and thereby confers the jurisdiction over the subject matter, that court would devise a method of proceeding, to effectuate the grant of power; and they therefore issued the writ, and determined the case upon the filing of an information.

Many objections have been taken to the affidavits filed in this case; but it is sufficient upon this motion if they show a reasonable ground for the rule.   And if they do not, yet if it appears *from* the process filed by the defendant, that the election was illegal, the rule must go. This, as we shall hereafter show, *does* appear, from their own papers herein filed.   See as to the sufficiency of affidavit, *Willcock,* Sec. 368, 376, 377, 378, 379—2 *East* 177.

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

And we contend that under these authorities the court should have required affidavits of the defendants, and heard nothing from them, until such affidavits were filed. And we further conclude that no affidavits on the part of the State are necessary, and that the court is bound to grant the rule, upon the mere motion of the State's attorney. The writ of quo warranto was the King's writ of right; the information was a criminal proceeding filed by the attorney or crown officer at his discretion; and even in cases where application has been made to the courts by *private* persons, for leave to file informations, the court has sometimes refused the leave, *but* referred them to the attorney general. See *R.* v. *Morgan*, 11 *Mod.* 309; *R.* v. *Lowther*, 2 *Ld. Raym.* 1409.

The objection that Messrs. Rapley and Cummins concurred in the election, is invalid. They are not *relators.* They have not *acquiesced* in the election. See *Willcock*, *Sec.* 406, *p.* 477; *R.* v. *Smith*, 3 *T. R.* 574; *R.* v. *Morris & Stewart*, 3 *East* 216; *R.* v. *Clarke*, 1 *East*, 47, *R.* v. *Binsted*, *Cowp.* 771.

RINGO, *Chief Justice*, delivered the opinion of the court:

On a former day of the present term, the attorney for the state and *ex-officio* attorney general, upon the affidavits of Charles Rapley and William Cummins, then read and filed with the clerk, moved the court for a rule on *Chester Ashley*, *Roswell Beebe*, *Elijah A. More*, *James DeBaun*, *Richard C. Byrd*, *William W. Stevenson*, and *James L. Dawson*, to appear and show cause why an information in the nature of a quo warranto should not be filed against them, for usurping the office of directors of the principal bank of the Real Estate Bank of the State of Arkansas.

After the motion was made, and the argument in support thereof commenced, *Chester Ashley*, one of the persons against whom said rule is asked, voluntarily appeared, and by leave of the court, was heard in opposition to the motion.

In considering this application, the first question to be decided, is, has this court original jurisdiction of an information in the nature of a quo warranto?

In support of the motion it is argued, that a writ of quo warranto and an information in the nature of a writ of quo warranto, are convertible terms, used in legal parlance to express the same thing; referring alike to the same proceeding, and prosecuted at common law to to accomplish precisely the same objects; that the convention, in adopting the

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
&. OTHERS.

terms used in the constitution, intended to embrace the proceeding by information in the nature of a quo warranto, as well as the proceeding by writ of quo warranto, and therefore the proceeding now sought to be instituted and prosecuted here is within the jurisdiction expressly granted to the constitution: and if it is not within the power expressly granted to issue writs of quo warranto, and to hear and determine the same; it it is a remedial writ, and is clearly within the terms "and other remedial writs," as used in the constitution.

In opposition to the motion it is insisted, that this is a court of exclusively appellate jurisdiction; that if it has original jurisdiction in any case, it does not extend to an information in the nature of a quo warranto, which is strictly a criminal proceeding. That such an information differs essentially from the ancient writ of quo warranto. That they were originally designed for different purposes, although in modern practice the same objects may in part be effected by either.

In the order in which the court has viewed this subject, it is first necessary to determine whether the proceeding by writ of quo warranto, and that of information in the nature of a quo warranto, are regarded by common law as being one and the same thing.

A writ of quo warranto at common law was a high prerogative writ, in the nature of a writ of right for the king, against him who obtained or usurped any office, franchise, or liberty of the crown. and also lay in case of nonuser or long neglect of a franchise, or misuser or abuse of it; 3 *Bl. Com.* 262.; *Sel. N. P.*, *4th Am. Ed.*, 322.

The authorities cited and referred to in the briefs, fully prove that it was a civil proceeding, prosecuted by the king's attorney general at the suit of the king, without any relation whatever, to try the mere civil right to some public office, franchise, or liberty of, or belonging to the crown; which was claimed or exercised by some person in opposition to, and in violation of the prerogative right of the sovereign: and in case of judgment for the defendant he was allowed the franchise, but when the king had judgment it was " that the franchise *capiatur in manum domini regis.*"

It results, therefore, from the nature of the proceeding, and the objects it was designed to accomplish, that it could only be prosecuted for the king, by his attorney general; the king, in his high corporate character, being alone interested or concerned in the only matter to be determined by it; that is, whether the mere right to the office, franchise, or liberty existed in the person claiming or exercising it by grant

or otherwise, or whether it belonged to the crown, no grant thereof ever having been made, or if granted being forfeited, and if the right was in the crown, the same never having been granted out, or the grant made being forfeited, the franchise was in either case restored to the king, that he might grant it out again to whomsoever he should please: and no fine was ever imposed, or punishment inflicted on the defendant.

As to the precise period of time when this ancient writ fell into disuse, or the more modern proceeding by information in the nature of a quo warranto was introduced, we are not informed, nor is it material.

Informations as the basis, or institution of a criminal prosecution, are said to have existed co-eval with the common law itself, but as a mode of investigating and determining civil rights between private parties, they seem to owe their origin and existence to the statute of 9th Anne, which expressly authorised the proceeding in all cases of *intrusion into, or usurpation of corporate offices in corporate places.* And although informations in the nature of a quo warranto, were exhibited by the king's attorney general long prior to that time, the remedy given thereby was never extended beyond the limits prescribed to the old writ, and could, therefore, only be granted for some usurpation on the prerogative rights of the crown, and it is said there is no precedent of such information having been filed or allowed at the instance, or on the relation of any private person previous to such statute of 9th Anne, nor could they be so exhibited afterwards, except in the cases mentioned in the statute, which neither increased or abridged the authority of the attorney general on that subject.

This proceeding by information, when originally introduced, like all other criminal informations of that period, was designed *principally* to punish offenders who were guilty of usurping the prerogative rights of the crown; yet upon conviction or disclaimer, the right of the crown being thereby established, there was, besides the fine, a judgment of ouster against the defendant, or that the franchise be seized into the king's hands, thus affording incidentally, a civil remedy for the king. And hence it is that all the authorities, ancient and modern, speak of the proceeding as being properly a criminal method of prosecution. It is, however, said to have been long since applied to the mere purpose of trying the mere civil right, seizing the franchise or ousting the wrongful possessor, the fine being nominal only. And, therefore, it

F

LITTLE ROCK, Jan'y 1839

THE STATE vs. ASHLEY & OTHERS.

was urged in the argument that it must be considered as a substitute for the ancient writ of quo warranto, which came into existence upon its disuse, and in 1607, fully occupied its place in the common law, and consequently, that the convention must be understood as referring to it, when they use the term writs of quo warranto, rather than the antiquated and obsolete proceeding by writ of quo warranto, which it cannot be supposed to have been their intention to revise.

To this argument we do not assent. The introduction of the latter, did not subvert or destroy the former; they may have had, and we do not doubt that they did have a contemporaneous existence; their primary objects were essentially different, and the mode of proceeding in them materially varied, while they were in some respects attended with different results, and the form of the judgment was never the same; one was strictly a civil, the other properly a criminal method of proceeding. We are, therefore, of the opinion that the proceeding by writ of quo warranto and information in the nature of a quo warranto as known to and regarded by the common law, are so different from each other, that they cannot with propriety be classed together, or comprehended by one common name or description.

This brings us to the first and most important question presented by the motion, that is, the question of jurisdiction. The duties of this court to exercise jurisdiction where it is conferred, and not to usurp it where it is not conferred, are of equal obligation. The constitution, therefore, and the law are to be expounded without a leaning the one way or the other, according to those general principles which usually govern the construction of fundamental or other laws.

This court is created by the constitution, and its jurisdiction and powers specially declared and limited by the same authority. The constitution is the paramount law of the land, and the original jurisdiction conferred and restrictions imposed by it, can neither be increased or diminished by any legislative power in the state, and all laws contrary thereto are void.

The second section of the sixth article of the constitution declares, " that the Supreme Court, except in cases otherwise directed by this constitution, shall have appellate jurisdiction only, which shall be co-extensive with the state, under such restrictions and regulations as may from time to time be prescribed by law. It shall have a general superintending control over all inferior and other courts of law and equity.

It shall have power to issue writs of error and supersedeas, certiorari and habeas corpus, mandamus, and quo warranto, and other remedial writs, and to hear and determine the same.   Said judges shall be conservators of the peace throughout the state; and shall severally have power to issue any of the aforesaid writs."

LITTLE ROCK, Jan'y 1839
THE STATE
vs.
ASHLEY & OTHERS,

It was obviously the intention of the constitution, by the first clause of the section above recited, to invest the Supreme Court with a general appellate jurisdiction, co-extensive with the state, and to confine its powers exclusively to subjects of this description; except in cases where it is directed by the constitution itself to exercise original jurisdiction.

The next clause confers upon the Supreme Court a general power of control over all inferior and other courts.

And the third clause gives to the Supreme Court, " power to issue writs of error and supersedeas, certiorari, and habeas corpus, mandamus, and quo warranto, and other remedial writs, and to hear and determine the same."   And it is relied upon as vesting in this court original jurisdiction of the case now under consideration, and it is admitted by all, that there is no other provision to be found in the constitution, upon which any claim of original jurisdiction for this court can be based.

In construeing the powers conferred by this clause of the constitution, the objects and purposes for which these powers were conferred must be kept constantly in view; and it must not be forgotten that this is only part of a system, or frame, or fundamental law of government, established by the people of the state according to their own free pleasure and sovereign will.   And that the powers, which are conferred, the restrictions, which are imposed, the authorities, which are exercised, the organization and distribution thereof, which are provided, are in each case for the same object, the common benefit of the governed, and not for the profit or dignity of the rulers.

In directing the organization of the judiciary department, it was the object of the convention to provide for the whole people of the state, through the several judicial tribunals, the most free, ample, speedy, cheap, and convenient administration of justice: for which purpose, various tribunals of different grades were ordained; and one or more of them established in every county and township in the state.   And a jurisdiction was conferred upon each by the constitution corresponding in interest and magnitude with their respective grade and dignity, in

LITTLE
ROCK,
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

such manner that the whole judicial power and authority of the government became vested in some one or another of the courts or justices of the peace.

The respective jurisdictions and powers thus conferred upon these several tribunals, is in every respect, special, limited and defined by the constitution; and so ordered, arranged, and distributed, as to avoid all conflict of authority between them, and to constitute a regular gradation of powers, each having a control and a revising authority over such others as are inferior to it; and to produce a harmonious action between the several branches of the whole system.

Having thus stated what we understand to have been the object and design of the convention in the arrangement and organization of the whole judiciary department of the government, as apparent from the structure of the constitution, and viewed as a whole, and also in its component parts: such construction must be put upon the powers which are conferred, and the restrictions which are imposed upon each of the several judicial tribunals, as is most consonant to the general intention and design of the framers of the constitution, and will be most effectual in enforcing and carrying into execution their expressed will.

That the will of the convention may be more apparent, we will here briefly state the jurisdiction and powers conferred and the restrictions imposed by the constitution upon each of the several tribunals, in which collectively is vested the whole judicial power of the state.

By the fifteenth section of the sixth article of the constitution, exclusive original jurisdiction of all matters of contract, (except in actions of covenant) where the sum in controversy is of one hundred dollars or under, is expresly conferred upon a justice or justices of the peace. And the justices of the peace are expressly prohibited from exercising jurisdiction in any case, " to try and determine any criminal case or penal offence against the state," but they may enquire of offences committed, and commit or admit to bail the offender, taking recognizance returnable to the proper court having jurisdiction of the case.

By the ninth section of the same article, jurisdiction is expressly given to the county courts, "in all matters relating to county taxes, disbursements of money for county purposes, and in every other case that may be necessary to the internal improvement and local concerns of the respective counties." And by the tenth section of the same article, "such jurisdiction in matters relative to the estates of deceased

persons, executors, administrators, and guardians, as may be prescribed by law, until otherwise directed by the general assembly, is given to the judge of probate."

LITTLE
ROCK;
Jan'y 1839

THE STATE
vs.
ASHLEY
& OTHERS.

The third, fourth, fifth, and sixth sections of the same article, prescribe and limit the jurisdiction and powers of the circuit courts, and bestow upon them " original jurisdiction over all criminal cases which shall not be otherwise provided for by law; and exclusive original jurisdiction of all crimes amounting to felony at common law; and exclusive original jurisdiction of all civil cases, which shall not be cognizable before justices of the peace, until otherwise directed by the general assembly; and original jurisdiction in all matters of contract, where the sum in controversy is over one hundred dollars," and give to them " superintending control over the county courts, and over justices of the peace," and declare that " they shall have power to issue all the necessary writs, to carry into effect their general and specific powers, and vest in them jurisdiction in matters of equity, until the general assembly shall deem it expedient to establish courts of chancery."

From this view of the structure and organization of the whole judiciary department, and also, of its component parts, and the distribution of jurisdiction and power to the several members or branches thereof, it appears manifestly, to have been the first great object of the convention, to confer upon the Supreme Court, as the final tribunal, to interpret, pronounce, and execute the law, to decide controversies, and enforce rights; powers and jurisdiction of an appellate nature only; and to leave with the inferior tribunals the first or original cognizance of cases and controversies between private parties, as well as all controversies in which the state might be a party, or otherwise interested, in which the sovereignty, or sovereign rights, powers, and franchises of the state are not involved; but in cases involving the civil rights of the sovereign power of the state, affecting vitally its character, and the proper administration of the government itself; in which the whole people, and every individual member of the community, has a direct, immediate, and most sacred interest, when the exercise of a public right or public franchise is the subject matter of controversy, the convention appears to have entertained a different view, and to have deemed it a proper subject to be investigated and determined in the first instance before the highest judicial tribunal in the

LITTLE
ROCK,
Jan'y 1839

THE STATE
*vs.*
ASHLEY
& OTHERS.

state; and with this view they authorised the Supreme Court, to issue "writs of quo warranto," and to hear and determine the same, thereby conferring upon this court, in such cases, original jurisdiction.

It is conceded by all that this court cannot take original jurisdiction of the present controversy under the authority given to it to issue writs of error, supersedeas, certiorari, habeas corpus, and mandamus, they being wholly inapplicable to the case in the form in which it is now presented. And this court has already determined, in effect, that the present proceeding is not within the power granted to "issue writs of quo warranto;" this being a proceeding of a very different nature, not included in that description.

We will now examine what jurisdiction or power this court can derive from the term, "other remedial writs," as used in the constitution. The terms here used are general, and their application is left indefinite. Did the convention intend thereby to authorise this court to issue every writ of a remedial nature known to the law, and to hear and determine the same? If they did, their declaration that this court "shall have appellate jurisdiction only, except in cases otherwise directed by the constitution," as well as their special grant of powers, to issue certain enumerated writs, each of which is of a remedial nature, is wholly unmeaning, if not positively absurd; and beside that, it would produce a direct conflict of authority between the several judicial tribunals, and involve them in the utmost confusion. It would destroy every vestige of harmony in the whole system, and virtually repeal every other grant of judicial power made by the constitution. It would draw to this forum original jurisdiction co-extensive with the state, of every civil controversy; for it must be observed, that in respect to the sum or amount involved, there is no restriction whatever imposed by the constitution, in any case in which this court can exercise original jurisdiction; therefore, if it can, under any authority derived from this general grant, take original jurisdiction of any case, it may of all cases falling within the same general class. These consequences are clearly not within the object and intention of the convention, but in opposition to both. And it is a rule founded upon the dictates of common sense, admitted by all jurists, that in construing a constitution or fundamental law of government, no construction of a given power is to be allowed, which plainly defeats or impairs the avowed objects.

If, therefore, the words are fairly susceptible of two interpretations

according to their common sense and use, the one of which would de- feat one or all of the objects for which it was obviously given, and the other of which would preserve and promote all, the former interpreta- tion ought to be rejected, and the latter to be held the true interpreta- tion.

The terms " other remedial writs," as before remarked, are indefinite, and may embrace a greater or less number, in proportion to the objects and purposes to which they are intended to be applied, and they might be applied to almost every purpose, with the single qualification, that it shall be in a proceeding of a remedial nature, as contradistinguished from proceedings of a criminal or penal character, which by the language used are expressly excluded. The terms used, must therefore, receive such a construction as will promote, rather than defeat the objects of the grant, or the general objects of the convention.

The context, and every other part of the whole instrument which relates to the organization of the judiciary, and the distribution of the judicial power, must be looked to in determining the power given by this general indefinite grant. These have all been carefully and critically examined by the court, and from them it appears satisfactorily, that it was the intention of the framers of the constitution to limit and restrict the Supreme Court in the exercise of original jurisdiction, to such cases as the writs therein specially enumerated would apply, and that the power to issue other remedial writs, was intended to embrace only such other writs as might be properly used in the exercise of appellate powers, or the power of control over inferior or other courts, expressly granted by the constitution. And such, in every point of view, in which they can be considered, is in the opinion of the court, the only legitimate, true, consistent, sensible, and practicable interpretation which they can receive.

It therefore results from the view taken of this subject by the court, that the Supreme court cannot, under any power conferred upon it by the constitution, exercise original jurisdiction in any case where the proceeding is, or must necessarily be of a criminal nature; its original jurisdiction being expressly limited and restrained by the constitution, to such matters of a civil nature as may be properly brought before the court, by some one of the writs expressly enumerated in the constitution; and the proceeding by information in the nature of a quo warranto, being properly a criminal proceeding, this court cannot entertain origi-

LITTLE ROCK, Jan'y 1839

THE STATE vs. ASHLEY & OTHERS.

nal jurisdiction of it.    And for this reason, the motion in this case must be denied and the rule refused.

The court does not, therefore, deem it necessary or proper, to express at this time, any opinion upon the question raised and argued at the bar, upon the facts presented in this case.

The motion is denied, and the rule refused.